ANNA DAVIS, *et al.*, Appellants, v. WILLIAM E. LATTA, *et al.*

DEED FROM AGED FATHER TO SON. Properly not set aside.

*Appeal from Polk District Court.*—HON. C. P. HOLMES, Judge.

SATURDAY, FEBRUARY 2, 1895.

Action to set aside a deed of conveyance. Judgment for defendants, and the plaintiffs appealed.—*Affirmed.*

*J. R. Good* and *St. John & Stevenson* for appellants.

*Bishop & Wilcoxen* and *Phillips & Phillips* for appellees.

Granger, J.—I. William Latta died on the tenth day of January, 1892, at the age of eighty-six years. He had been twice married, and by the first marriage there came to him seven children, six of whom are living, and four of whom are the plaintiffs. There were by the second marriage three children. The defendants were the children of William Latta, except one, who is the wife of defendant William E. Latta. On the twenty-third day of December, 1891, William Latta made to his son William E. Latta a deed of one hundred and sixty acres of land; and the purpose of this suit is to set aside said conveyance, on the ground that it was fraudulently obtained, through undue influence, and because said William Latta, at the time of the conveyance, was in such condition of body and mind as to render him incompetent for such a transaction. The answer puts in issue the averments of the petition. On the day of the execution of the deed, William Latta and his son William E. made the following agreement in writing, which indicates the purpose of the conveyance:

"This article of agreement, made and entered this 23d day of December, A. D. 1891, by and between William Latta, of Polk county, Iowa, party of the first part, and William E. Latta, of the same place, party of the second part, is as follows: The party of the first part being desirous of making a disposition of certain of his real estate among his children, and the party of the second part being his son, the said party of the first part has this day made, executed, and delivered to the said party of the second part a deed of conveyance, conveying to him the following described real estate, lying and being in Polk county, Iowa, to-wit: The southwest quarter (¼) of section seventeen, township eighty-one north, range twenty-five west of the fifth principal meridian, Iowa, containing one hundred and sixty acres more or less. The consideration

expressed in said deed being $4,000.00, and said real estate being of greater value than said party of the first part desires to give as legacy to party of the second part, it is therefore understood and agreed by and between the parties hereto that party of the second part is to pay to party of the first part, as part consideration for said conveyance, the sum of $1,200.00, the same to be paid in cash. And the party of the second part, being unable to pay said $1,200 on this date, agrees to make a loan of said amount on said real estate, and, for the purpose of enabling him to make such loan and raise said sum of money, the deed conveying the same to him is this day delivered to him, and it is understood and agreed by and between the parties hereto that said $1,200.00 is to be and remain a lien on said real estate until the same is paid; and the party of the second part is to proceed at once to negotiate said loan, and the said $1,200.00 to be paid within a reasonable time for him to procure said loan on said real estate; and, upon the payment of said $1,200.00 by the party of the second part to the party of the first part, the same is to be received and accepted by him in full consideration and full payment for said real estate, except that party of the first part is to receive from party of the second part, as a further consideration therefor, his board, washing, mending, and having a home with him, and all necessary provisions, care, and attention for one of his years and declining health, during the remainder of his natural life. And party of the second part hereby binds himself to provide for party of the first part a comfortable home with him, in his family, to furnish him board and all necessary and proper care and attention for one of his years and declining health, free of charge, during the remainder of his life. In witness whereof, we hereunto sign our names, at Des Moines, Iowa, this 23d day of December, 1891.

                                              his
            "(Signed)                    William  X  Latta.
                                              mark.
                                         "William E. Latta.
      "Witness:  F. K. Butler.  W. W. Phillips."

The District Court specifically found that "there is no evidence showing, or tending to show, that the defendant William E. Latta ever exercised, or attempted to exercise, any such influence over the said William Latta, deceased; and that the allegations in plaintiff's petition to the effect that the person named in the petition, William Latta, father of the defendant, was of unsound mind at the time of the execution of the deed, 'or that it was obtained by fraud,' is not supported or warranted by the evidence."

It will be observed that the finding as to undue influence is very conclusive, and to the effect that the evidence does not even *tend* to show such a fact. We think, when the record is fairly considered, the language of the finding is justified. Even though it should be

conceded that, in view of the admitted condition of William Latta, as to age and physical weakness, at the time of the conveyance, the burden is with defendant to show that the transaction is free from fraud or undue influence, we are still of the opinion that the finding is warranted. It seldom happens that in a case of this character this important branch of it is free from doubt. William Latta, at the time he made the deed in question, was, from age and consequent weakness, stooped, and he walked with a cane. His hearing was poor, and also his sight. The evidence in support of the averments of the petition as to his incompetency is by testimony from a daughter (Mrs. Davis), her daughter, and some other witnesses who knew Mr. Latta the later years of his life. Mrs. Davis saw her father about five years before his death, and she testifies as to his being very old and feeble, and that he could not hear. She also said that he was almost blind at times, and "terribly and extremely nervous." Her daughter testified that she saw him about four years before his death, and she testifies to a state of facts much the same as her mother did. There is other testimony from neighbors and others who had some business transactions with him, who say the business was done by his wife or one of his sons, and they further say that he seemed incompetent to do business. This testimony is very inconclusive, and the business referred to as having been done by others, in his presence, for him, was generally of a character that, without any question of incompetency, might well have been done by others for one so advanced in years and physically weak. There can be no question but that Mr. Latta was, for years before his death, in such a condition bodily that, almost as a matter of course, the business of the farm would have been looked after by his family, regardless of his mental condition. It may be said that such is the usual experience of those in a like situation. Such business would likely be an undue tax upon his strength, and that fact alone would be an inducing cause for others of the family to do such business for him. Much importance seems to be attached to the fact that he did not attend to the business of the farm.

The testimony for the defendants far outweighs that of plaintiffs, because it is of a character to show better the actual condition of his mind. One daughter, who lives in Des Moines, a Mrs. Cassidy, testified that he was at her house about December, 1891, which we understand to be about the time of making the deed, and talked with her particularly about the disposition of the property, or "how he wanted to fix his business." He stayed with her all night. He told her he wanted to deed each of the older children a lot, and give each two hundred dollars in money. Mrs. Cassidy was one of the older children. He told her that William was to have the farm, except one thousand two hundred dollars; and William was to take care of him. It does not appear that any one else was present at this conversation. William was not. This is the plan that was carried out, as

we understand, on the next day. The papers were made at the office of Mr. Phillips, in Des Moines. The testimony of Mr. Phillips shows that both William Latta and William E. came to his office, and the business was directed by William Latta, who explained to Mr. Phillips how he wanted to dispose of his property among his children. Mr. Phillips agrees with the witness for the plaintiffs as to his physical condition, and he says that, without a further test, he would have thought him incompetent for such a transaction; but he says that, after talking to him about the children, the improvements of his farm, and as to how he wished to dispose of his property, with other facts as to the best manner of making a disposition of his property, he thought he had a clear conception of his business transactions, and was perfectly competent to make a will. The testimony of Mr. Phillips is quite convincing as to the mental capacity of Mr. Latta. The lots deeded to the other children were worth about one hundred and fifty dollars to two hundred dollars each, and it is said the farm was worth forty dollars per acre. This, of course, would be a very unequal distribution of property among children. But that of itself does not show mental incapacity. The farm was his home, where he desired to remain, and he was to be cared for during his lifetime. The value of such care was a matter of much uncertainty. The evidence clearly shows that he had in mind, in doing what he did, the fact that he should not give William too much, and he thought to give him the farm would be too much, and William was required to make a payment of one thousand two hundred dollars. The following is the testimony of Dr. Brockhart, the physician who attended him in his last sickness: "I am a practicing physician in Polk City. Have been there about three and a half years. I became acquainted with Mr. Latta about two years before his death. I attended him in his last sickness. I was called about two days before he died. La grippe was the occasion of his death. When I was first called to see him, he was rational. He asked me if I thought he would get well. I told him I did not think he would. I saw him on the following day. He was not conscious at that time. When I first called, I did not see anything but what he was perfectly rational. He was very sick then, but what conversation I had with him I did not see anything but that he was perfectly rational. I never met him until I saw him on his deathbed. It was from the seventh to the fifteenth of January last. I was called there one day, and went back the next day, which was the afternoon before his death. That is all I know about the old gentleman." This testimony has strong corroboration in other testimony of physicians and farmers who knew him for years before his death. It is a case in which the man in advanced years, after the loss of his wife, who died about a year before, was not only making a final disposition of his property, but he was making provision for his support and a home in a way to meet his wishes. It is true he lived but a short

time after the provision was made, but the right to make such a provision is none the less sacred or important to him, and courts should not, upon so feeble a showing, disturb such a transaction. The case is without a taint of bad faith, and we think the action of the court in sustaining the transaction was proper, and its judgment is *affirmed.*